REGENTS OF THE UNIVERSITY OF MINNESOTA and National Computer Systems, Inc., a Minnesota Corporation, Plaintiffs,

v.

APPLIED INNOVATIONS, INC., a New Jersey Corporation, Defendant.

No. 3–86–683.

United States District Court,
D. Minnesota,
Third Division.

Oct. 9, 1987.

Dorsey & Whitney by Thomas Tinkham and Stuart Hemphill, Minneapolis, Minn., for plaintiffs.

Maslon, Edelman, Borman & Brand by Gary Haugen and Virginia A. Bell, Minneapolis, Minn., and Saidman, Sterne, Kessler & Goldstein by William F. Patry, Washington, D.C., and Ralph Gordon, Frederick, Md., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

ALSOP, Chief Judge.

The above-entitled matter came before the court for trial on May 4 through May 18, 1987. Plaintiffs, Regents of the University of Minnesota ("Regents") and National Computer Systems, Inc. ("NCS"), commenced this action against Applied Innovations, Inc. ("AI"), on August 1, 1986, alleging claims of copyright infringement (Count I); trademark infringement and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count II); trademark infringement under Minn.Stat. § 333.28(a) (Count III); common law trademark infringement and unfair competition (Count IV); and deceptive trade practices

within the meaning of Minn.Stat. § 325D.44, subd. 1(1)–(3), (5) and (12) (Count V).

Defendant AI counterclaimed for declaratory judgment that the copyrights asserted by the plaintiffs are invalid or were not infringed upon (Count I); for declaratory judgment that the plaintiffs misused their copyright interest (Count II); for declaratory judgment and damages for intentional interference with business relations (Count III); and for alleged violations of Section 1 and 2 of the Sherman Act (Counts IV and V).

Following a hearing on plaintiffs' motion for summary judgment, the court dismissed defendant's first, second, fourth, and fifth counterclaims against the Regents, except to the extent they seek declaratory or prospective injunctive relief, and dismissed defendant's third counterclaim in its entirety against the Regents. In addition, the court dismissed defendant's second counterclaim in its entirety against NCS. The parties have agreed to bifurcate for a later trial AI's third, fourth, and fifth counterclaims and, in addition, the parties have waived their right to jury trial on all claims. Having considered the evidence and being fully advised in the premises, the court makes the following:

## FINDINGS OF FACT

1. Plaintiff Regents is a constitutional corporation established by charter of the territory of Minnesota to act as the governing body of the University of Minnesota.

2. Plaintiff NCS is a corporation organized under the laws of the state of Minnesota with its principal place of business at 11000 Prairie Lakes Drive, Eden Prairie, Minnesota 55344.

3. Defendant AI is a corporation organized under the laws of the state of New Jersey with its principal place of business in South Kingston Office Park, Suite A–1, Wakefield, Rhode Island 02789.

4. During the late 1930's, University of Minnesota Professors Starke R. Hathaway and J. Charnley McKinley began the task of creating a psychometric test to be used by medical and psychological professionals to provide an objective assessment of certain personality characteristics or traits. After years of effort Hathaway, McKinley, and their associates created the Minnesota Multiphasic Personality Inventory ("MMPI") test and scoring data.

5. The MMPI can be dissected into four interrelated types of materials.

(a) Test statements or test items—short declarative questions. The questions are to be answered true, false, or cannot say.

(b) Scale membership or scale definitions and item direction for scoring—scale membership and scoring direction represents the author's determination that certain responses (scoring direction) to certain test statements (scale membership) indicates a particular personality characteristic or the reliability of the test score. There are ten basic or clinical scales (hypochondriasis, depression, conversion hysteria, psychopathic deviate, masculinity-femininity, paranoia, psychasthenia, schizophrenia, hypomania, social introversion) and four validity scales (cannot say score, lie, infrequency, K-correction).

(c) Normative statements or T score conversion data—is the form of presentation the authors selected to compare raw scores on the different scales and an individual's raw score to a normative group (the Minnesota adult normals).

(d) Statement correlation tables—the MMPI test is administered in four different formats, the standard Group Form, R Form, S Form, and the MMPI 168. The latter two tests are short versions of the Group Form test and the R Form test merely presents the questions in a different order. The correlation tables pairs the test statement numbers of the various versions of the test with the corresponding numbers of the same statements in the standard Group Form.

6. Hathaway and McKinley began the process of creating the MMPI by determining and defining the personality traits they wanted to identify with their proposed psychometric test. Unlike previous psychometric tests, the authors wanted to use the test to identify a wide range of psychological traits. To this end, the authors compiled a list of more than 1,000 potential test statements. The test items were derived from psychiatric examination direction forms, psychiatric textbooks, earlier published scales of personal and social attitudes, and the authors own clinical experience. None of the test items taken from prior literature, however, was used in their original form, although some of the prior statements were redrafted with only slight modifications. The authors attempted to correct perceived deficiencies of prior psychometric tests by redrafting these prior test statements into short, simple, declarative, true/false statements.

The authors then commenced on the long and tedious process of determining which of their 1,000 plus test items assisted in identification of particular personality traits, a process appropriately called building scales. Although there were some minor variations in the building of the individual scales, a crude, general description of the process is as follows. The authors selected individuals that had been diagnosed as manifesting the personality trait they were attempting to identify. Then Hathaway and McKinley would compare their responses to the test items to the responses of a group of Minnesota adults (typically friends and relatives of patients at the University of Minnesota Hospital) and a control group of University of Minnesota students. Based on this comparison, a particular test item was initially selected as a discriminating test item if the percentage frequency difference between the criterion group (individuals manifesting the clinical trait) and the group of Minnesota adults ("normals") was a statistically significant amount, which varied from one scale to another.

Wanting to further distinguish between persons manifesting other major psychosis, as well as persons considered normal, Hathaway and McKinley eliminated additional test statements by comparing responses of individuals exhibiting other major psychosis to the responses of the criterion group. The authors also attempted to correct the false positive problem by administering the tentative scale to individuals not exhibiting the psychological trait they were trying to identify, and eliminating those statements eliciting a false positive response. Finally, Hathaway and McKinley eliminated some test statements because they thought they were inappropriate and for other unknown reasons.

There are several alternative ways to build scales other than the contrasted group method used by Hathaway and McKinley. Two other such methods are the internal consistency and rational or theoretical methods. Indeed, some individuals have used these alternative methods to create their own scales using MMPI test statements to identify the same personality trait identified by Hathaway and McKinley, although selecting different test statements than those selected by Hathaway and McKinley.

After building the discriminating scales, Hathaway and McKinley selected the T formula as the norming device for comparing the raw scores on the different scales and an individual's raw score to a normative group (the Minnesota adult normals). The authors chose to divide the normal group into male and female to eliminate non-trait factors which were not eliminated by the scale building process. Also, Hathaway and McKinley adjusted the T score for the normal group based upon their own judgment. In addition, the T formula was not used on the lie and infrequency scales. Instead, the authors relied on their experience and percentiles when norming these scales.

There are several alternative norming devices that might have been used by the authors and have been used by other authors of psychometric scales, such as percentile ranking, decile ranking, linear T-score transformation, nonlinear T-score transformation, Z score transformation, and stanine transformation.

7. The first scale built by Hathaway and McKinley was the hypochondriasis scale. The 103 test items making up the scale, scoring direction, and the corresponding T score conversion data were first published in volume 10 of the Journal of Psychology at pages 255 through 268 on Oct. 28, 1940. There was a general notice of copyright to the Journal Press on the title page of the Journal and the first page of the article. The article did not contain a separate notice of copyright to the authors or the Regents.

8. On May 8, 1942, the University of Minnesota Press published with notice of copyright to the University of Minnesota 100 copies of an article entitled *The Minnesota Multiphasic Personality Schedule.* The article contained 550 test items, the scale membership, scoring direction, and T score conversion data for the following clinical and validity scales: hypochondriasis, depression, hysteria, psychopathic deviate, interest (masculinity/femininity) question, lie, and validity.

9. On July 6, 1942, an article authored by Hathaway and McKinley which contained the scale membership, scoring direction, and T score conversion data for the depression scale was published in volume 14 of the Journal of Psychology at pages 73 through 84.

10. In their post-trial submissions, plaintiffs assert that an article authored by Hathaway and McKinley which was published in Volume 26 of the Journal of Applied Psychology at pages 614 through 624 was not published until November 20, 1942. This article contained the scale membership, scoring direction, and T score conversion data for the psychasthenia scale. There was not a notice of copyright to Hathaway and McKinley on this article. Plaintiffs argue further that a publication entitled *Manual for The Minnesota Multiphasic Personality Inventory* was published with notice of copyright to the University of Minnesota on October 30, 1942. This publication contained all of the scales contained in the May 8, 1942 University of Minnesota Press Publication and, in addition, contained the scale membership, scor-

ing direction, and T score conversion data for the paranoia, psychasthenia, and schizophrenia scales.

Because the article appearing in Volume 26 of the Journal of Applied Psychology is contained in what is referred to as the October issue of the Journal and because the work entitled *The Minnesota Multiphasic Personality Inventory* contains a footnote reference to the Journal article in question, the court finds that the article in Volume 26 of the Journal of Applied Psychology was published prior to the publication entitled *The Minnesota Multiphasic Personality Inventory.*

11. In 1943 a publication entitled *The Minnesota Multiphasic Personality Inventory (revised edition)* was published with notice of copyright to the University of Minnesota. The publication contained all scales previously contained in the 1942 Minnesota Multiphasic Personality Inventory, and, in addition, contained the scale membership, scoring direction, and T score conversion data for the hypomania scale.

12. In 1944, an article authored by Hathaway and McKinley which contained the scale membership, scoring direction, and T score conversion data for the hysteria, hypomania, and psychopathic deviate scales was published in Volume 28 of the Journal of Applied Psychology at pages 153 through 174.

13. In 1946, an article authored by Professor Lewis E. Drake was published in Volume 30 of the Journal of Applied Psychology at pages 51 through 54. In the article, the author described his use of the Social I.E. scores on the Minnesota T–S–E Inventory for a group of female students as a criterion, to perform an item analysis of the Minnesota Multiphasic Personality Inventory.

14. In 1946, an article authored by Hathaway and Paul E. Meehl was published in Volume 30 of the Journal of Applied Psychology at pages 525 through 564. In the article, the authors discussed the need for a scale to detect the subtle conscious or unconscious tendency of subjects to present a defensive or self-critical picture of themselves when taking the MMPI. To

detect this subtle distortion, the authors created the K scale. The scale membership and scoring direction for the K scale was contained in the article. In addition, the authors discussed the need to adjust the scores on some of the basic clinical scales taking into account the test-taking attitudes mentioned above. The K-correction factor that was ultimately incorporated into the MMPI was not contained in this article.

15. In 1951, the University of Minnesota Press published with notice of copyright to the University of Minnesota *The Minnesota Multiphasic Personal Inventory Manual (revised)* which contained, *inter alia,* the scale membership, scoring direction and T score conversion data for the Social I.E. Scale.

16. In 1960, the University of Minnesota Press published with notice of copyright to the University of Minnesota *An MMPI Handbook* which contained, *inter alia,* the K-correction factor for the hypochondriasis, psychopathic deviate, psychasthenia, schizophrenia, and hypomania scales.

17. Throughout the process referred to as "building scales," Hathaway and McKinley allowed certain individuals who were assisting them to use the MMPI test statements for purposes of administering the MMPI test. This distribution of the test statements was to a select group for a limited purpose and the authors expressly or impliedly restricted the recipients right to further distribution.

18. Prior to May of 1942, the MMPI test statements and the scale membership, scoring direction, and T score conversion data for the hypochondriasis scale and several other tentative and permanent scales were distributed to Dr. Burton P. Grimes, who was associated with the state hospital at Fort Benning, Georgia, to Mr. H.D. Rempel, who was associated with the federal reformatory at El Reno, Oklahoma, to Colonel G.W. Guthrie, medical officer at Fort Snelling, as well as to the Minnesota State Home for the Girls in Sauk Centre, Minnesota, to be used for diagnostic purposes. This distribution of the test was to a select group for a limited purpose and the au-

thors impliedly restricted the recipients' right to further distribution.

19. On March 14, 1942, J.C. McKinley and S.R. Hathaway assigned to the University of Minnesota their copyright interest in *The Minnesota Multiphasic Personality Schedule* and all revisions thereof.

20. On May 27, 1986, Nettie M. Evans assigned to the University of Minnesota all right, title, and interest to a list of publications involving the MMPI. (See plaintiffs' Exhibit 180).

21. On May 23, 1986, Louise E. Swedien assigned to the University of Minnesota all right, title, and interest to a list of publications involving the MMPI. (See plaintiffs' Exhibit 181).

22. On October 16, 1986, Paul E. Meehl assigned to the University of Minnesota all his right, title, and interest in and to the works known as the Minnesota Multiphasic Personality Inventory. (See plaintiffs' Exhibit 182).

23. On February 28, 1955, W. Grant Dahlstrom and George Schlager Welsh assigned to the University of Minnesota their publication rights and copyright in a work entitled *The MMPI Handbook: A Guide to its Use in Clinical Practice and Research* and all revisions thereof.

24. On October 21, 1986, Mildred Drake assigned to the University of Minnesota all her right, title, and interest in and to the works known as the Minnesota Multiphasic Personality Inventory.

25. On June 30, 1986, the Psychological Corporation assigned to the University of Minnesota all its rights, title, and interest in the following copyrights:

1. Copyright Registration No. AA 42832—*Supplementary Manual for the Minnesota Multiphasic Personality Inventory.*

2. Copyright Registration No. A 954009—*The Minnesota Multiphasic Personality Inventory.*

3. Copyright Registration No. A 878345—NCS Answer Sheet for the Minnesota Multiphasic Personality Inventory: Form R.

4. Copyright Registration No. A 906927 —Minnesota Multiphasic Personality Inventory: Form R.

26. On April 22, 1987, the Helen Dwight Reid Educational Foundation assigned its right, title, and interest in and to the following articles published in the Journal of Psychology, Volume 10, 1940:

1. *A Multiphasic Personality Schedule (Minnesota): I. Construction of the Schedule,* by S.R. Hathaway and J.C. McKinley, M.D.

2. *A Multiphasic Personality Schedule (Minnesota): II. A Differential Study of Hypochondriasis,* by J.C. McKinley, M.D. and S.R. Hathaway.

27. The Regents submitted Certificates of Registration from the United States Copyright Office for each version of the MMPI test as follows:

| Title of Publication | Copyright Registration |
|---|---|
| A Multiphasic Personality Schedule (Minnesota): I. Construction of the Schedule and | B 479185 |
| A Multiphasic Personality Schedule (Minnesota): II. A Differential Study of Hypochrondiasis | B 479185 |
| The Minnesota Multiphasic Personality Schedule | AA 402456 |
| The Minnesota Multiphasic Personality Inventory | AA 418866 |
| The Minnesota Multiphasic Personality Inventory (Group Form) Revised Edition | AA 440705 |
| The Minnesota Multiphasic Personality Inventory (Individual Form) Revised Edition | AA 440706 |
| Supplementary Manual for the Minnesota Multiphasic Personality Inventory | AA 42823 |
| Minnesota Multiphasic Inventory Manual Revised 1951 | A 57392 |
| An MMPI Handbook: A Guide to Use in Clinical Practice and Research | AA 464496 |
| Minnesota Multiphasic Personality Inventory–Form S | A 816009 |
| Minnesota Multiphasic Personality Inventory–Form R Stepdown Booklet | A 875377 |

| Title of Publication | Copyright Registration |
|---|---|
| Minnesota Multiphasic Personality Inventory Manual Revised 1967 | A 942883 |

28. The above copyrights that are no longer in their original term of copyright were renewed in compliance with the Copyright Act of 1909, and Certificates of Renewal Registration were issued by the Registrar of Copyrights and are identified and dated as follows:

| Renewal Registration | Renewal Date |
|---|---|
| R 438857 | July 9, 1968 |
| R 478857 | February 2, 1970 |
| R 480414 | March 9, 1970 |
| R 497572 | December 30, 1970 |
| R 497573 | December 30, 1970 |
| R 571995 | March 1, 1974 |
| RE 35–270 | September 26, 1979 |

29. Plaintiff Regents has acquired all rights, title and interest in and to the copyrights and renewals listed above by assignments that have been properly recorded in the Copyright Office—with the exception of the assignment agreement dated April 22, 1987, from the *Psychological Journal* for which plaintiff Regents had not yet received a certificate of recordation, but which plaintiff has sent to the Copyright Office for registration. Plaintiff Regents is the sole proprietor of all rights, title and interest in and to the copyrights and renewals.

30. Professors Hathaway and McKinley applied for and received WPA funding between March 21, 1938 and February 26, 1943, to assist them in their work on the MMPI. The funds were paid pursuant to subproject numbers 262 and 379. Total funding was $7,462.46. The money was used to pay clerical workers, usually two workers at any given time period. The clerical workers' primary responsibilities were transcribing, tabulating, and summarizing the data collected from the administration of the MMPI test.

31. During the time period of WPA funding, the MMPI project was closely followed by WPA inspectors who prepared progress reports approximately every eight months. In these reports, the inspectors discussed the need and justification for WPA assistance, with regard to the likeli-

hood that the project would succeed, and would benefit society in the short and long range.

32. Most of the MMPI works published during the time period of WPA funding contained a footnote acknowledging WPA assistance. Three representative examples of the acknowledgement given are as follows:

Prepared on Works Progress Administration Official Project No. 665–71–3–69, Sub–Project No. 262.

Assistance in the preparation of this material was furnished by personnel from the Work Projects Administration Official Project No. 165–1–71–124, Sub–Project No. 379.

Supported in part by Work Projects Administration Office Project No. 165–1–71–124, Sub–Project No. 379.

This type of acknowledgement was discussed by the WPA inspectors in their progress reports and was deemed an appropriate acknowledgement. The inspectors did not refer to the MMPI publications as reports to the WPA.

33. None of the WPA progress reports mentioned the copyrightability of the MMPI publications.

34. The January 4, 1939, WPA report reads, in part, as follows:

All original material gathered on this sub-project will be filed at the completion of the work in Room 126, Millard Hall, and will be rubber stamped or labeled with the proper WPA official project number notation.

Hathaway and McKinley placed all the original raw data necessary to calculate the T scores for the Minnesota adult normals for the basic scales in Room 126, Millard Hall.

35. The August 29, 1942, WPA progress report refers to and quotes extensively from the University of Minnesota Press publication entitled *The Minnesota Multiphasic Personality Schedule.* All 100 copies of the Minnesota Multiphasic Personality Schedule contained a notice of copyright to the University of Minnesota.

36. The parties have verbally stipulated that if a WPA operating procedure was promulgated by the WPA regulating the copyrightability of WPA funded projects, it would be operating procedure No. W–11 as revised July 1, 1938.

37. WPA operating procedure No. W–11 (revised July 1, 1938) was promulgated by the WPA.

38. WPA operating procedure No. W–11 as revised July 1, 1938, reads, in part, as follows:

Section 5. *Acknowledgement of Works Progress Administration Participation* All published material growing out of research, financed in whole or in part by funds allotted to the Works Progress Administration, shall bear on the fly-leaf *or title page* an acknowledgement of the assistance provided by the Works Progress Administration. Form of this acknowledgement shall be as follows: "Published by _____

(legal sponsor or co-sponsor, if any) as a report on *Official* Project No. ____ conducted under the auspices of the Works Progress Administration." In the case of project reports incorporated in periodicals, bulletins, books, or other publications *not devoted primarily to results of such research projects*, an acknowledgement to the Works Progress Administration shall appears as a footnote to the title of the project report. *The form of this acknowledgement shall be as follows: "Assistance in the preparation of these materials was furnished by the personnel of Works Progress Administration Official Project No. ____." * In addition, the names of the individual research specialists or participating organizations may be given their proper credit.

\*    \*    \*    \*    \*    \*

Section 6. *Copyright* Data secured or reports published from studies financed in whole or in part by funds allotted to the Works Progress Administration are intended for public use. Copyrighting of any such research, statistical and survey materials by an individual or an organization, public or private, shall not be

sought *except where such materials are included in copyrighted scientific periodicals, books, or other publications not devoted primarily to results of Works Progress Administration projects. Whenever research project reports are included, together with other scientific materials, in such copyrighted publications it shall be understood that holders of the copyrights shall not be entitled to restrict public use of the data collected and/or analyzed as activities of survey and research projects operated under the auspices of the Works Progress Administration.*

39. WPA operating procedure W–11 (revised July 1, 1938) was never published in the *Federal Register.*

40. Although the University of Minnesota agreed to adhere to the rules and regulations of the WPA, the court finds that the University was not aware of operating procedure No. W–11 (revised July 1, 1938) at the time it entered into the agreement and did not, at the later date, agreed to be bound by this operating procedure.

41. The WPA construed the MMPI publications as publications not devoted primarily to the results of Works Progress Administration projects and as copyrightable work.

42. The parties stipulated that:
Of the material claimed by the University of Minnesota, Applied Innovations, Inc. copied (in a lay sense of the word) 38 test statements (so-called "Grayson critical items"), scale membership and item direction for scoring for 13 basic scales (L, F, K, Hs, D, Hy, Pd, Mf, Pa, Pt, Sc, Ma, Si), norms (T scores) for those scales (for the Minnesota adult normal group), K-correction factors, the Minnesota Adult norms for five K-corrected scales (Hs + .5K, Pd + .4K, Pt + 1K, Sc + 1K, Ma + .2K), correlation tables for correlation of test statements from Form R to Group Form. That copying was done by Applied Innovations, Inc. or its associates, either directly from materials of the University of Minnesota or from others that reproduce such material with permission.

43. AI's MMPI Scoring Software Program I directly copied the 38 test statements referred to as the "Grayson critical items". AI's MMPI Scoring Software Program II does not directly copy any test items, but, instead, provides direction to the software user on how to copy the user's self-chosen MMPI test statements into the software program. Once the user has typed in the statements, the copied statements that are answered by the patient in the critical direction are printed along with the report on the patient's score. The capacity of AI's MMPI Program II to accommodate the insertion of test statements by the user has no other use than for copying the MMPI test statements.

44. Although there are substantial portions of each of the materials plaintiffs are alleging a copyright in that AI did not copy, AI copied everything of commercial significance with regard to scoring and interpreting the MMPI test. The court finds that AI has copied a material and substantial portion of the works that the plaintiffs are alleging a copyright in.

45. The University of Minnesota or its agents did not knowingly or willfully make misrepresentations to the copyright office when obtaining the copyright registrations for the MMPI publications.

46. In the early 1950's, the University of Minnesota began using the acronyms "MMPI" to identify the Minnesota Multiphasic Personality Inventory and related products and services.

47. In 1983, the University of Minnesota obtained Minnesota Trademark Registration No. 8385 for the service mark "MMPI." There is a strong identification between the "MMPI" mark and the University of Minnesota.

48. The defendant's use of the plaintiffs' trademark was not such that it was likely to cause a consumer of MMPI products to be confused as to the source of the different products.

49. Plaintiff NCS is and has been the exclusive commercial licensee of plaintiff Regents for distribution of the MMPI test

products and services pursuant to licensing agreements dated April 30, 1982, and February 1, 1986, which were duly recorded with the Office of Copyright. As the commercial licensee of plaintiff Regents, NCS is authorized to copy, print or otherwise reproduce and distribute in the United States and Canada portions of the MMPI test, and to sublicense others to do so.

50. To the extent any conclusion of law constitutes a finding of fact, the same is incorporated herein by reference.

## CONCLUSIONS OF LAW

### I. *Copyrightability of MMPI.*

■ 1. Plaintiff Regents' Certificates of Registration covering the materials admittedly copied by AI constitute *prima facie* evidence of the validity of the copyrights, and all facts stated therein, including a rebuttal presumption of originality. *See* 3 M. Nimmer, *Nimmer on Copyright* § 12.11[A] (1986). AI has challenged the validity of plaintiffs' copyrights, alleging that various aspects of the MMPI are not copyrightable. Consequently, defendant has the initial burden of showing lack of copyrightability. *Id.*

■ 2. Under the 1909 Act, as interpreted by the courts, and as expressly provided in the 1976 Act, only original works of authorship are subject to copyright protection. Originality is "one pervading element" essential for copyright protection regardless of the form of the work. 1 M. Nimmer, *supra* p. 18, § 2.01. The originality requirement as provided in the 1976 Act was intended to codify without change the concept of "originality" applied by the courts under the 1909 Act. H.R.Rep. No. 1476, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code Cong. & Ad.News 5659, 5664. "The standard for 'originality' is minimal." *West Publishing Co. v. Mead Data Central, Inc.,* 799 F.2d 1219, 1223 (8th Cir.1986). The "work" must simply be the product of some creative intellectual or aesthetic labor, but not novel or unique. *Goldstein v. California,* 412 U.S. 546, 561, 93 S.Ct. 2303, 2312, 37 L.Ed.2d 163 (1973); *West,* 799 F.2d at 1223; *Hutchinson Tele-*

phone Co. v. Fronteer Directory Co., 770 F.2d 128, 131 (8th Cir.1985). Little more is required than a prohibition of actual copying. *West,* 799 F.2d at 1223; 1 M. Nimmer, *supra* p. 18, § 2.01.

■ There is no copyright protection, however, for an idea, concept, principle, or discovery. *Mazer v. Stein,* 347 U.S. 201, 217–18, 74 S.Ct. 460, 470–71, 98 L.Ed. 630 (1954); *Baker v. Selden,* 101 U.S. (11 Otto) 99, 102–03, 25 L.Ed. 841 (1880). But there may be a valid copyright in an original form of expression of an idea, concept, or discovery. *Toro Co. v. R & R Products Co.,* 787 F.2d 1208, 1211 (8th Cir.1986).

### A. *Test Statements.*

■ 3. AI argues that the individual MMPI test statements are not copyrightable because the statements are short phrases within the meaning of 37 C.F.R. § 202.1(a), the statements were copied from prior works, and because defendant only copied a small percentage of the 550 test statements. The court disagrees, and concludes that the test statements easily satisfied the originality requirement.

■ 4. Copyright protection will be denied to "fragmentary works and phrases" and to forms of expression dictated solely by functional characteristics because such material does not exhibit the minimal level of creativity necessary to warrant copyright protection. 1 M. Nimmer, *supra* p. 18, § 201[B]. Specifically, 37 C.F.R. 202.1(a) states that the following works are not subject to copyright:

Words and short phrases such as names, titles, and slogans; familiar symbols or designs; mere variations of typographic ornamentation, lettering or coloring; mere listing of the ingredients or contents.

5. Notwithstanding the terse and simplistic form of the test statements, Hathaway and McKinley used sufficient creative intellectual labor in assembling and revising or rewriting the test statements. Indeed, simplicity was the expressed goal of the authors, and involved significant independent intellectual effort. Consequently,

the court concludes that the test statements are not short phrases as defined in 37 C.F.R. § 202.1(a).

6. While it is true that Hathaway and McKinley relied on psychiatric examination direction forms, psychiatric textbooks, scales of personal and social attitudes, in addition to their own clinical experience, when drafting the test statements, none of these prior works were actually copied. Instead, the authors utilized the ideas contained in the prior statements, and redrafted the questions into short, simple, declarative, true/false statements. The substantial majority of the 550 test statements were significantly modified or created whole cloth by the authors. The court concludes that there was sufficient independent intellectual effort on the part of the authors in creating the test statements so as to satisfy the originality requirement.

7. Because the test statements are copyrightable as original material, plaintiffs are entitled to copyright protection for the test statements as a whole or any portion thereof. *See Hedeman Products Corp. v. Tap–Rite Products Corp.*, 228 F.Supp. 630, 633 (D.N.J.1964); *Colonial Book Co. v. Amsco School Publications, Inc.*, 41 F.Supp. 156 (S.D.N.Y.1941).

### B. *Testing Data.*

■ 8. Defendant argues that the scoring direction, scale membership, and T score conversion data for the various scales were simply discovered facts that a person exhibiting certain personality traits will answer a certain question in a certain way. The Court of Appeals for the First Circuit confronted virtually the identical issue in *Rubin v. Boston Magazine Co.*, 645 F.2d 80 (1st Cir.1981). The author in *Rubin* created "love" and "liking" scales consisting of 26 questions designed to elicit one's feeling about another. The court rejected the defendant's argument that the scales were merely a method to discover a scientific fact. This court concurs with the First Circuit's judgment that methods used to assess human characteristics or traits are not within the meaning of discovered facts

in the context of copyright law. *See* 1 M. Nimmer, *supra* p. 18, § 2.03[E].

■ The evidence demonstrates that Hathaway and McKinley exercised substantial judgment and creative intellectual effort when determining which answers to which questions would suggest a particular personality trait. Moreover, the T score conversion data is not a mere accidental marriage between the raw score and an arbitrary value. Instead, the authors exercised significant judgment and creative intellectual effort in deciding which norming device to use, and after making that decision what categories the Minnesota adult normals should be placed in for purposes of comparison. In addition, the T scores were adjusted by the authors. Accordingly, the court concludes that the scale membership, scoring direction and T score conversion data for the 14 scales are original works of authorship and satisfy the originality requirement.

### C. *Correlation Tables.*

■ 9. Plaintiff Regents claim a copyright in its correlation tables as compilations. A compilation results from a process of selecting, bringing together, organizing, arranging, and presenting previously existing material. The copyright protection is in the form in which the material is presented and not the material itself. In determining whether an individual is entitled to copyright protection based upon a compilation, the Eighth Circuit has applied the "sweat of the brow" test. *Hutchinson Telephone Co. v. Fronteer Directory Co.*, 770 F.2d 128, 131 (8th Cir.1985). In the instant case, the court is satisfied that plaintiffs' efforts in compiling, sorting, arranging and presenting the information contained in the correlation tables is sufficient to satisfy the originality requirement and justify copyright protection as a compilation.

### II. *Prior Publications.*

10. Because the works alleged to be infringed were published prior to the effective date of the Copyright Act of 1976 (January 1, 1978), questions of compliance

with statutory requirements such as notice, publication, registration, and renewal are governed by the Copyright Act of 1909. 1 M. Nimmer, *supra* p. 18, § 4.01[A].

11. There is a split of authority concerning whether a registration certificate creates a presumption in favor of the plaintiffs that notice formalities have been duly observed. 3 M. Nimmer, *supra* p. 18, § 12.11[B]. For purposes of its findings of fact and conclusions of law, the court concludes that plaintiffs have the burden of proving compliance with the notice provision of the Copyright Act of 1909.

12. The 103 test statements that comprise the hypochondriasis scale and the scale membership, scoring direction and T score conversion data for the hypochondriasis were *first* published in a 1940 Journal of Psychology article. Plaintiff Regents are entitled to assert an undiminished copyright interest in the material contained in this 1940 Journal of Psychology article entitled *A Multiphasic Personality Schedule (Minnesota): II. A Differential Study of Hypochondriasis* because the owners of the general copyright interest in the article (Helen Dwight Reid Educational Foundation) assigned its copyright interest to the Regents and alternatively, because the Regents were assigned the "beneficial owners" (Hathaway and McKinley) copyright interest in the article. *See Goodis v. United Artist Television, Inc.*, 425 F.2d 397 (2d Cir.1970).

13. The remaining 447 test statements and the scale membership, scoring direction, and T score conversion data for the depression, hysteria, psychopathic deviate, interest, question, lie and validity scales were *first* published in a May 8, 1942, University of Minnesota Press publication entitled *The Minnesota Multiphasic Personality Schedule*, with proper notice of copyright to the University of Minnesota.

14. The scale membership, scoring direction, and T score conversion data for the psychasthenia scale were *first* published in an article in Volume 26 of the Journal of Applied Psychology at pages 614 through 624. The article did not contain a notice of copyright to Hathaway and McKinley. In addition, no evidence was presented suggesting that the proprietor of the Journal of Applied Psychology obtained a general copyright in the Journal which Hathaway and McKinley might have had a copyright interest in as "beneficial owners." Consequently, the above-mentioned material is in the public domain.

15. The scale membership, scoring direction and T score conversion data for the paranoia and schizophrenia scales were *first* published in a 1942 University of Minnesota Press publication entitled *Manual for the Minnesota Multiphasic Personality Inventory*, with proper notice of copyright to the University of Minnesota.

16. The scale membership, scoring direction, and T score conversion data for the hypomania scale were *first* published in a 1943 publication entitled *The Minnesota Multiphasic Personality Inventory (revised edition)*, with proper notice of copyright to the University of Minnesota. In 1944, this same material was published in Volume 28 of the Journal of Applied Psychology at pages 153 through 174.

17. The scale membership, scoring direction, and T score conversion data for the Social I.E. scale were *first* published in a 1951 University of Minnesota Press publication entitled *The Minnesota Multiphasic Personality Manual (revised)*, with proper notice of copyright to the University of Minnesota.

18. The scale membership and scoring direction for the K scale were *first* published in a 1946 article entitled *The K Factor as a Suppressor Variable in the Minnesota Multiphasic Personality Inventory* in Volume 30 of the Journal of Applied Psychology at pages 525 through 564. The article did not contain a notice of copyright to the authors, Paul E. Meehl and Stark R. Hathaway. However, the proprietor of the Journal of Applied Psychology did obtain and present a general notice of copyright, and the "beneficial owners" of that copyright (Meehl and Hathaway) assigned their copyright interest in this article to the University of Minnesota. *See Goodis v. United Artist Television, Inc.*, 425 F.2d 397 (2d Cir.1970). Consequently, the Univ-

ersity of Minnesota is entitled to copyright protection in the scale membership and scoring direction of the K scale.

19. The K-correction factor for the hypochondriasis, psychopathic deviate, psychasthenia, schizophrenia and hypomania scales were *first* published in a 1960 University of Minnesota Press publication entitled *An MMPI Handbook*, with notice of copyright to the University of Minnesota.

20. A limited publication is a publication "which communicates the contents of a manuscript to a definitely select group, and for a limited purpose, without the right of diffusion, reproduction, distribution or sale." *White v. Kimmell,* 193 F.2d. 744 (9th Cir.1952): *See generally* 1 M. Nimmer, *supra* p. 18, § 4.13[A].

21. The distribution of the MMPI test to those individuals administering the test for purposes of building the MMPI scales was a limited distribution. The tests were given to a select group of individuals for the limited purpose of administering the test to build scales, and the authors expressly or impliedly restricted the recipient's right to further distribution.

22. The distribution of the MMPI to Dr. Burton P. Grimes, Dr. H.D. Rempel, to Col. G.W. Guthrie, and to the Minnesota State Home for the Girls at Sauk Centre, Minnesota, was a limited distribution. The distribution was to a select group of individuals for the limited purpose of administering the test for diagnostic use, and the authors impliedly restricted the recipients right to further distribution.

III. *Assignments.*

23. For those copyrighted works which were initially registered in the Regents' name, the defendant has the burden of controverting the Regents' claim of title. 3 M. Nimmer, *supra* p. 18, § 12.11[C]. For those copyrighted works which were initially registered by a third party, the plaintiffs have the burden of proving their chain of title. *Id.*

24. Plaintiff Regents has acquired valid assignments for all material it is asserting a copyright interest in.

IV. *WPA Funding.*

25. The court concludes that AI's assertion that WPA operating procedure no. W–11 (revised July 1, 1938) deprives plaintiffs of a copyright in the MMPI is an affirmative defense to plaintiffs' infringement claim. Consequently, defendant has the burden of proving that the above-mentioned operating procedure was promulgated by the WPA, and that the University of Minnesota was aware of the operating procedure and agreed to be bound by it. On the other hand, plaintiffs have the burden of proving that the WPA consented to the copyrighting of the MMPI.

26. WPA operating procedure no. W–11 (revised July 1, 1938) was promulgated by the WPA.

27. WPA operating procedure No. W–11 (revised July 1, 1938) was not published in the *Federal Register* as required by the Federal Register Act and regulations issued thereunder, and the University of Minnesota was not aware of this operating procedure at the time it entered into the agreement with the WPA to abide by the rules and regulations of the WPA. Consequently, the operating procedure was not legally binding on the Regents. *See, United States v. Aarons,* 310 F.2d 341 (2nd Cir.1962).

28. The MMPI publications were publications "not devoted primarily to the results of Works Progress Administration projects" as provided for in WPA operating procedure No. W–11 (as revised July 1, 1938), and were interpreted as such by the WPA. Consequently, the WPA construed the MMPI publications as copyrightable work.

29. In exchange for WPA funds for the MMPI project, the University of Minnesota and Hathaway and McKinley agree to make available to the public the original data collected on the project. This original data was made available to the public upon completion of the project and housed in Room 126 Millard Hall on the University of Minnesota campus.

## V. *Infringement.*

30. In an infringement action, a plaintiff must show ownership and copying. 4 M. Nimmer, *supra* p. 18, § 13.01. The court concludes that plaintiff Regents was the legal proprietor of the copyrights of most of the material admittedly copied by the defendant. (*see* plaintiffs' exhibit 224 and finding of fact number 36). Although defendant limits the word "copied" in the stipulation to the "lay sense of the word," the court concludes that defendant's copying of the material listed in the stipulation constitutes an infringement within the meaning of the Copyright Act.

31. Defendant's competitive, commercial use of the copyrighted materials is more than a diminimus infringement. S.Rep. No. 473, 94th Cong., 1st Sess. 65 (1975), quoted in *Harper & Rowe Publisher v. The Nation Enterprises*, 471 U.S. 539, 105 S.Ct. Rep. 2218, 2235, 85 L.Ed.2d 588 (1985) ("a use that supplants any part of the normal market for a copyrighted work would ordinarily be considered an infringement"). Indeed, AI copied everything of commercial significance with regard to scoring and interpreting the MMPI test.

32. Although the court has concluded that Regents has a copyright in the correlation tables as compilations and that AI copied the contents of these tables, the plaintiffs failed to show that defendant reproduced the information in the same arrangement as the plaintiffs'. Since a compilation copyright is limited to its selection, coordination or arrangement, plaintiffs have not established infringement of the plaintiffs copyright in the correlation tables.

## VI. *Copyright Misuse.*

33. The University of Minnesota or its agents did not knowingly or willfully make misrepresentations to the copyright office when obtaining the copyright registration for the MMPI publications. *See Knickerbocker Toy Co. v. Winterbrook Corp*, 554 F.Supp. 1309, 1320–21 (D.N.H.1982).

## VII. *Statutory and Common Law Trademark Infringement, Statutory and Common Law Unfair Trade Practices and Deceptive Trade Practices.*

34. Although the University of Minnesota has a valid and strong trademark in the "MMPI" mark, the defendant's use of the plaintiffs' MMPI mark was not such that it was likely to cause the sophisticated consumers of MMPI products to be confused as to the source of the different products. *See e.g., Vitek Systems, Inc. v. Abbott Laboratories*, 675 F.2d 190, 192 (8th Cir.1982); *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 489 (1st Cir.1981); *Water Gremlin Co. v. Ideal Fishing Float Co.*, 401 F.Supp. 809, 811 (D.Minn.1975). Consequently, the plaintiff has failed to establish a trademark infringement and unfair competition claim under the Lanham Act, under Minn.Stat. § 333.28 or under Minnesota common law. In addition, the plaintiffs have failed to establish a deceptive trade practices under Minn.Stat. § 325D.44.

## VIII. *Damages.*

35. Plaintiffs are entitled to recover actual damages resulting from defendant's infringement. 3 M. Nimmer, *supra* p. 18, § 14.02[A]. Actual damages are typically determined by considering the net profits the plaintiff would have earned but for the defendant's infringement. 3 M. Nimmer, *supra* p. 18, § 14.02[A].

36. The average per customer revenue for the noninterpretive micro test programs for the year 1986 for NCS was $1,104.00 ($157,888.00 divided by 143 customers).

37. Plaintiffs lost 227 customers as a result of defendant's infringement. To arrive at its figure, the court made several adjustments to the plaintiffs' suggested figure of 584 customers. First, the court subtracted 16 customers from the AI customer list of 584 to reflect 12 duplicate customers on the list, and four sales to foreign customers. Second, the court reduced the AI customer base by 20 percent to reflect the number of AI customers that

would not have used the NCS micro test programs even if the defendant did not infringe because of the significant difference in cost between the NCS programs and the AI programs. Finally, the court reduced the AI customer base by 50 percent to reflect the percentage of AI customers who owned or used computers that were incompatible with NCS programs. It is reasonable to conclude that the AI customers with incompatible computer systems would not have used NCS programs even if AI did not infringe.

38. Multiplying the number of customers plaintiffs lost as a result of defendant's infringement (227) by the average per customer revenue for NCS ($1,104.00) results in a yearly lost gross revenue of $250,608.00.

39. Because there was insufficient reliable information regarding the actual costs the plaintiffs would have incurred as a result of the increased sales, the court concluded it would be reasonable for plaintiffs to realize a 20 percent net profit on gross sales, which was the projected divisional profit objective for the micro test product for the year 1987. (*See* defendant's exhibit 95.) Multiplying the lost gross revenue ($250,608.00) by 20 percent results in a yearly lost net revenue of $50,121.00.

40. Plaintiffs will incur this lost revenue for five years which is the average time the AI customer would continue to use their current computer systems.

41. Plaintiffs' total lost net revenue is $250,608.00 ($50,121.00 × 5 years).

42. The present value of the plaintiffs' damage award is $227,023.00. The court relied on the 5.2 percent discount rate adopted by the Minnesota state courts pursuant to Minn.Stat. § 604.07 when calculating the present value of the damage award. The initial year of lost income was not reduced to a present value because it reflects the lost income from August, 1986, to August, 1987. The remaining four years of lost income were reduced to present value by the above-mentioned discount rate.

43. To the extent any finding of fact constitutes a conclusion of law, the same is incorporated herein by reference.

## JUDGMENT

Upon the foregoing findings of fact and conclusions of law,

IT IS ORDERED That the Clerk enter judgment as follows:

IT IS ORDERED, ADJUDGED AND DECREED That the Regents of the University and National Computer Systems, Inc., have and recover from Applied Innovations, Inc., the sum of Two Hundred Twenty Seven Thousand and Twenty Three ($227,023.00) Dollars, together with their costs and disbursements as taxed and allowed.

IT IS FURTHER ORDERED That upon the posting of security in the form of a bond in the sum of Five Thousand ($5,000.00) Dollars, that an injunction in the form attached shall issue.